# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **ALLAN HARGARTEN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | No. 05 C 6006 |
| | ) | |
| **THOMAS DART, in his capacity as Sheriff** | ) | Judge Rebecca R. Pallmeyer |
| **of Cook County, SALVADOR GODINEZ,** | ) | |
| **in his capacity as Executive Director of the** | ) | |
| **Cook County Department of Corrections;** | ) | |
| **THE COUNTY OF COOK,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Allan Hargarten was stopped by Chicago police for a traffic offense and detained on an outstanding DuPage County warrant. In this action, he claims that Defendant Cook County officers overstated the bond amount set in the DuPage warrant, with the result that he was held in custody for eight days; had Defendants disclosed truthful information concerning the bond, Hargarten asserts, he would have been able to post the bond and would have been released promptly. Hargarten claims violations of his due process rights. Named as Defendants are Thomas Dart, the Sheriff of Cook County, and Salvador Godinez, Executive Director of the Cook County Department of Corrections ("CCDOC") in their official capacities. In an earlier ruling, the court dismissed a state law claim as time-barred and a claim against the County as redundant of Plaintiff's claims against County officials, but otherwise denied Defendants' motion to dismiss. *See Hargarten v. Sheahan*, No. 05 C 6006, 2006 WL 3087108, at *1 (N.D. Ill. Oct. 27, 2006). Defendants now seek summary judgment on the remaining claims. For the reasons set forth below, the motion is granted.

## FACTS

The following facts have been taken from the parties' Local Rule 56.1 statements and

responses, and are not in dispute, unless otherwise indicated. Where a party's response to a Local Rule 56.1 statement of fact does not directly contradict the fact in question and the underlying support for the fact is sound, the court deems that fact admitted.[1]

At some point prior to April 11, 1996, Plaintiff was charged with driving on a suspended license and fined $230. On April 11, 1996, DuPage County officials issued a bench warrant for Plaintiff's arrest as a result of his failure to appear in court on the suspended license charge. (Pl.'s. 56.1 ¶ 1; Intrastate Hold Affidavit, Ex. E to Defs.' Mot. for Summ. J.) Bond on the warrant was a $3,000 D-Bond[2], which required the posting of cash in the amount of 10 percent of the total bond, in this case, $300. (*Id.*)

On November 6, 2003, Officer James F. Ciannella of the Chicago Police Department (hereinafter "CPD") arrested Plaintiff for running a stop sign. (Defs.' 56.1 ¶ 1.) Officer Ciannella told Plaintiff that DuPage County had issued a warrant for his arrest with a bond amount of $30,000.

---

[1]    Plaintiff prepared a response to Defendants' Local Rule 56.1 Statement of Facts pursuant to Local Rule 56.1(b)(3)(A) and a Statement of Additional Facts ("SOAF") pursuant to Local Rule 56.1(b)(3)(B), but inadvertently failed to file them. He cited to the documents, however, throughout his Response to Defendant's Motion for Summary Judgment. Defendants submitted a reply to Plaintiff's Response to Defendants' Motion for Summary Judgment and an SOAF pursuant to Local Rule 56.1(a)(3), but for obvious reasons could not file a response to Plaintiff's missing Local Rule 56.(b)(3)(B) response or to Plaintiff's missing Local Rule 56.(b)(3)(C) SOAF. After becoming aware of Plaintiff's oversight, the court granted Plaintiff's motion for leave to file a response to Defendants' Rule 56.1 Statement and a Rule 56.1 Statement. In addition, the court granted Defendants leave to file an amended reply to Plaintiff's response, a response to Plaintiff's Local Rule 56.1(b) SOAF, and an amended Rule 56.1(a)(3) SOAF .
    Defendants' Local Rule 56.1 Statement of Material, Uncontested Facts is cited as "Defs.' 56.1 ¶ ___"; Plaintiff's Response to Defendants' Local Rule 56.1 Statement of Material, Uncontested Facts is cited as "Pl.'s 56.1 Resp. ¶ __"; Plaintiff's Local Rule 56.1(b) Amended Statement of Additional Facts [Dkt. No. 144] as "Pl.'s SOAF ¶ __"; Defendants' Local Rule 56.1(a)(3) Response to Plaintiff's Amended Statement of Additional Facts [Dkt. No. 148] as "Defs.' 56.1 Resp. ¶ __"; Defendants' Local Rule 56.1(a)(3) Statement of Additional Facts [Dkt. 149] as "Defs.' SOAF ¶ __"; Plaintiff's Answer to Defendants' Local Rule 56.1(a)(3) Statement of Addition Facts [Dkt. 152] as "Pl.'s 56.1 Reply ¶ __."

[2]    The court understands that a "D-Bond" or a "detainer bond" is one permitting release of the detained person on payment of 10% of the face amount of the bond. *See* http://legacy.cookcountygov.com/Agencies/ccpd_cjs_brochure.htm, last visited January 13, 2009.

(Defs.' 56.1 ¶ 2; Hargarten Dep. 11:14-12:14, Ex. A to Defs.' 56.1.) Plaintiff assumed the warrant must be for a traffic offense, but did not believe the bond amount could be as high as $30,000. (Pl.'s 56.1 ¶ 4.) Plaintiff testified in his deposition that he asked Officer Cianella to confirm that the bond amount was in fact $30,000, but could not recall Officer Cianella's response. (Hargarten Dep. 15:9-18, Ex. A to Defs.' 56.1.) Officer Cianella took Plaintiff into custody, and CPD booked him and held him overnight. (Pl.'s 56.1 Reply ¶ 5.) Plaintiff testified that he had just under $300 on his person when he was arrested. (Hargarten Dep. 78:14-16, Ex. 4B to Pl.'s Mem. in Supp. of His Mot. for Summ. J.)

The following morning, November 7, 2003, Plaintiff was transported from CPD to an area of Cook County Jail known as "the bridge,"[3] where he was processed by Deputy Jennifer Bailey and Deputy Jason Dugger of the Cook County Sheriff's Department. (Defs.' 56.1 ¶ 17; Pl.'s SOAF ¶ 2.) Before Cook County accepts custody of an inmate, CPD must supply the following paperwork to the deputy sheriffs at "the bridge": a transmittal form, "ICU" background,[4] the arrest report, any tickets and/or any misdemeanor or felony complaints, any out-of-county warrants, and a "goldenrod" (presumably a reference to its color)—a cover sheet stating the arrestee's name, date of birth, hair and eye color, weight, and a brief summary of his arrest. (Pl.'s SOAF ¶ 3.) If there is also an out-of-county warrant for the inmate, the CPD must submit an "intrastate hold affidavit," apparently what happened in this case. (Pl.'s SOAF ¶ 4; Intrastate Hold Affidavit: CCDOC copy, Ex. E to Defs.' Mem. in Supp. of Their Mot. for Summ. J. (hereinafter "Defs.' Mem.").) An intrastate hold affidavit sets forth the information in the out-of-county warrant, including the amount of bond set in the

_____

[3] The parties have not further explained this, but plaintiffs in another case assert that "the bridge" is a reference to holding cells in the basement of the Criminal Courts building where detainees await bond hearings. *See* Plaintiff's Memorandum in Support of Motion for Partial Summary Judgment, Doc. No. 114 in the electronic case file for *Jackson v. Sheriff of Cook County*, No. 06 C 493 (Coar, J.), at page 5.

[4] Neither party identifies what an "ICU background" consists of, but the court presumes it is a type of background check.

warrant. (Intrastate Hold Affidavit: CCDOC copy, Ex. E to Defs.' Mem.; DuPage County Warrant, Ex. F to Defs.' Mem.) Cook County Sheriff's Department procedure calls for deputy sheriffs on "the bridge" to check the information contained in the CPD inmate's paperwork against the information on the transmittal form before taking the arrestee into custody. (Pl.'s SOAF ¶ 3.) If any of the required paperwork is missing or not in proper order, Sheriff's Department procedure requires the deputy clerk to refuse to accept custody of the inmate. (Defs.' 56.1 ¶ 24.) Sheriff's Department policy also dictates that the deputy clerk prepare two copies of the inmate's paperwork, one for the Circuit Court clerk's office and the other for the CCDOC LEADS (Law Enforcement Acquisition Data System) department. (Pl.'s SOAF ¶ 5.) The Sheriff's Department personnel deposit the paperwork for the court in the courtroom clerk's basket, and courtroom clerks then assemble an arrestee's permanent court file from those documents. (Pl.'s SOAF ¶ 11.) In addition, a Sheriff's deputy creates a "call sheet," a document listing the names and jail identification numbers of people in custody who have cases on the day's court call; the courtroom deputy refers to the "call sheet" throughout the daily court call. (Defs.' 56.1 SOMF ¶ 8.)

Defendants admit that there were two different versions of Plaintiff's intrastate hold affidavit: the version filed in the courtroom clerk's basket, which eventually became part of the court's permanent file, stated that bond was set at $3,000, and another version, the one in the CCDOC's LEADS file, stated that bond was set at $30,000. (Defs.' Resp. ¶ 7.) Defendants further admit that the courtroom clerk's office did not prepare any of the information contained on the intrastate hold affidavit sent to the courtroom clerk's basket. (Pl.'s SOAF ¶ 12, 13; Defs.' 56.1 Resp. ¶¶ 6, 13.) If the deputy clerk became aware of any incorrect information in the intrastate hold affidavit or other paperwork, Sheriff's Department policy required that she notify the court clerk or the judge. (Defs.' 56.1 ¶ 23.) No one in the Sheriff's office had access to the court copies of the paperwork after they were delivered to the court clerk. (Pl.'s SOAF ¶ 6.)

After Cook County accepted custody of Plaintiff on November 7, a public defender was

appointed to represent him, and he appeared before Judge Kevin Sheehan in a hearing to set bond on the traffic charges as well as the outstanding DuPage County warrant. (Defs.' 56.1 ¶¶ 6-7, 19.) During the hearing, Shawn McGee, a deputy clerk of the court, notified Judge Sheehan that Plaintiff had no criminal background other than the traffic violation before the court and the outstanding warrant in DuPage County. Deputy McGee told the court that the DuPage County warrant was issued for failure to appear in a seven-year-old traffic case for driving with a suspended license, and that the bond on that warrant was set at $30,000. (*Id.* ¶ 7.) Deputy McGee's source for this information was the call sheet prepared by a Sheriff's deputy, which identified an outstanding warrant for Plaintiff, noted as "DuPage 30K 96TR001360." (*Id.* ¶ 8.) Deputy McGee testified that it was his practice during bond hearings to consult only the call sheet, and that on November 7, he adhered to that practice; that is, he consulted Plaintiff's call sheet only and did not look at the paperwork in the court clerk's file. (McGee Dep. 19:17-20:11, 27:17-28:11, Ex. B to Defs.' Mem.) In his deposition, Plaintiff stated that at this time he tried to make the court aware that the bond amount on the DuPage County warrant was incorrect, but the judge interrupted him. (Hargarten Dep. 23:21-24:11, 25:11-18, Ex. 4A to Pl.'s Am. Resp. to Defs.' Mot. for Summ. J. ("Pl.'s Am. Resp.").) Plaintiff also told his public defender about the incorrect bond amount; the record does not reveal whether the attorney attempted to inform the judge of the mistake. (Hargarten Dep. 25:5-10, Ex. 4A to Pl.'s Am. Resp.) According to Plaintiff, the court did ask Deputy McGee again to confirm the bond amount on the DuPage County warrant, and Deputy McGee, referring to the call sheet, again announced that the bond was set at $30,000. (Pl.'s Compl. ¶ 44.) Plaintiff pleaded guilty to the Cook County traffic charge. (*Id.* ¶ 11.) Judge Sheehan remanded Plaintiff on the DuPage County warrant and ordered the bond to stand at $30,000, thus requiring Plaintiff to post $3,000 bail for his release from custody on the DuPage charge. (*Id.* ¶¶ 10, 11.)

After the hearing, Plaintiff remained in Cook County Jail for seven days, until November 13, 2003, when he was retrieved by DuPage County officers. (*Id.* ¶¶ 12-14.) During that time, Plaintiff

made numerous attempts to bring the error in the bond amount to the attention of the Cook County Sheriff's Department. Plaintiff's first three attempts occurred while he was in line during medical processing. First, Plaintiff approached a deputy at a medical checkpoint after the hearing. Plaintiff explained his situation and asked the deputy to whom he could speak about the false bond; the deputy did not respond. (Pl.'s SOAF ¶¶ 16-17.) Next, Plaintiff tried to speak with another Sheriff's Department employee while waiting in line during the medical process. When he leaned across the employee's desk to speak with her, "she pushed him off the desk and told him to shut up and get back in line." (*Id.* ¶ 18.) Finally, Plaintiff stepped out of line during a strip search to speak with a deputy, and another deputy "threw [Plaintiff] up against the wall for stepping out of line." (*Id.* ¶ 19.)

Later during his incarceration at CCDOC, Plaintiff made two more attempts to speak with Sheriff's Department employees. (*Id.* ¶ 20.) When an officer brought his first meal, Plaintiff told the officer that he was being wrongly held on a $30,000 bond for a traffic offense. (*Id.* ¶ 21.) According to Plaintiff, the officer said he could do nothing personally for Plaintiff, but offered to try to arrange for a chaplain to speak with him. (*Id.* ¶ 21.) The following day, Plaintiff spoke with another officer, who promised to discuss the situation with his own superior. (*Id.* ¶ 22.) Plaintiff testified that he received no response to these inquiries. (*Id.* ¶ 23.)

Plaintiff remained in Cook County custody until November 13, 2003, when officers of the DuPage County Sheriff's Department transported him to DuPage County Jail at around 1:30 p.m.[5] (*Id.* ¶ 36.) Shortly thereafter, Plaintiff appeared before a judge who reduced his bond to $1,000, requiring Plaintiff to post $100. (*Id.* ¶ 33.) A friend posted that amount for the bond, and Plaintiff was released from DuPage County custody at approximately 3:24 p.m. on November 13. (*Id.* ¶ 36.)

---

[5]     Plaintiff had been scheduled to return to court in Cook County on November 12, 2003, but that appearance was canceled when the DuPage County Sheriff's Department notified CCDOC that its officers would pick up Plaintiff on the morning of November 13. (Defs.' SOMF ¶ 40, CCODC Warrant Information Letter, Ex. F to Defs.' SOMF.)

At the time of Plaintiff's incarceration, the Records Division of CCDOC was responsible for contacting outside agencies when inmates held on out-of-county warrants were ready for pickup. (Defs.' Resp. ¶ 29.) In 2003, the Records Division was staffed seven days a week, including holidays. (Defs.' Resp. ¶ 34.) Lieutenant Desaree Zeno-Johnson, the Records Division Unit Commander in November 2003, testified that, since at least 1991, CCDOC has had a policy of promptly notifying outside agencies and counties of any detainees being held on outstanding warrants; specifically, the policy calls for notice no later than the morning after the detainee is taken into custody and his or her paperwork is received. (Zeno-Johnson Dep. 31:5-32:21, Ex. F to Defs.' SOMF.) According to Lieutenant Zeno-Johnson, in 2003 the CCDOC notified outside agencies by phone when an inmate was ready for pickup but did not maintain a record of this initial notification to the outside agency. (Zeno-Johnson Dep. 22:12-19, Ex. 9 [Dkt. 133] to Pl.'s Am. Resp.) There is in fact no written record of CCDOC's initial contact with DuPage County to arrange for pick-up of Plaintiff. (Zeno-Johnson Dep. 81:6-13, Ex. 9 to Pl.'s Am. Resp.) Janet Tyner, an administrative assistant in the CCDOC Records Division, testified that in 2003, the policy was not always adhered to; it was common for the Records Division to take more than a day to notify an outside agency and "one to three days" was typical. (Tyner Dep. 19:5-13, Ex. 5A [Dkt. 24] to Pl.'s Am. Resp.) Even so, according to Ms. Tyner, CCDOC policy did call for notice to outside agencies the following day, and further, CCODC policy would not authorize holding an inmate for as long as four or five days on an out-of-county warrant without notifying the outside county. (Tyner Dep. 34:22-35:2, Ex. 5B [Dkt. 26] to Pl.'s Am. Resp.) Ms. Tyner had no personal recollection of Plaintiff during his incarceration in Cook County Jail in November 2003. (*Id.* 20:3-10.)

In 2003, Lieutenant Howard Keltner was head of the DuPage County Fugitive Apprehension Unit ("DPCFAU"), in charge of coordinating all transports to DuPage County. (Pl.'s SOAF ¶ 31; Keltner Dep. 8:4-16, Ex. 2A [Dkt.120] to Pl.'s Am. Resp.). According to Lieutenant Keltner, the DPCFAU did not have a formal policy concerning pickup of inmates from other locations, but the

common practice was to pick up inmates within 24 to 48 hours of being contacted by the agency with custody between the hours of 8:00 a.m and 4:00 p.m. (Pl.'s SOAF ¶ 32.) Inmates were often picked up within 24 hours, depending on the time of day the outside agency contacted DPCFAU. (*Id.* ¶ 33.) Like the CCDOC, DPCFAU had transport crews on duty seven days a week around the clock, including Veterans Day, November 11, 2003. (*Id.*) Also like CCDOC, DPCFAU did not maintain written records of the date/time on which outside counties first notified them of inmates being held on DuPage County warrants. Lieutenant Keltner did not recall any specific delays in transporting inmates from Cook County to DuPage County custody in 2003. (Keltner Dep. 17:6-24, Ex. 2 [Dkts. 120, 121] to Pl.'s Am. Resp.)

## DISCUSSION

Summary judgment is appropriate where the court, having reviewed all pleadings, depositions, transcripts, discovery responses, exhibits and affidavits, finds that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In determining whether a genuine issue of material fact exists, the court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The moving party bears the burden of showing that there is no issue of material fact in dispute, and once that burden is met, the nonmoving party must demonstrate the existence of a specific and material factual issue to avoid summary judgment. *Celotex Corp.,* 477 U.S. at 324; *Hicks v. Midwest Transit, Inc.*, 500 F.3d 647, 651 (7th Cir. 2007). A genuine issue of material fact is raised when a reasonable trier could find in favor of the nonmoving party on that issue. *See, e.g., Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008).

## A. Plaintiff's Claims Limited to Due Process against Cook County

Plaintiff brings suit under § 1983 against the individual Defendants in their official capacities

and against the municipality of Cook County, claiming violations of his Fourth and Fourteenth Amendment rights. As a preliminary matter, the court notes that Plaintiff's Fourth Amendment claims drop out of the case; that amendment "governs the period of confinement between arrest without a warrant and the preliminary hearing at which a determination of probable cause is made, while due process regulates the period of confinement after the initial determination of probable cause." *Armstrong v. Squadrito*, 152 F.3d 564, 569 (7th Cir. 1998) (citing *Villanova v. Abrams*, 972 F.2d 792, 797 (7th Cir.1992)). Plaintiff alleges that he suffered a constitutional deprivation during the period of detention following his initial probable cause hearing. His claims therefore arise under the Fourteenth Amendment only.

A second preliminary matter is the identity of the Defendant. It is well established that a suit against an officer in his official capacity is a suit against the government entity for which the officer works. *Kentucky v. Graham*, 473 U.S. 159, 165-55 (1985). Plaintiff's suit against Officers Dart and Godinez in their official capacities is therefore treated as a suit against Cook County. To impose § 1983 liability on a government entity, Plaintiff must establish the existence of an official policy or custom on one of three theories:

> (1) an express policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority.

*Phelan v. Cook County*, 463 F.3d 773, 789 (7th Cir. 2006) (quoting *Roach v. City of Evansville*, 111 F.3d 544, 548 (7th Cir.1997)); *see Monell v. Dept. of Soc. Servs.*, 436 U.S. 658 (1978).

Both counts of Plaintiff's Fourth Amended Complaint invoke the second theory. Count I alleges an unwritten but widespread practice of intentionally altering the bond amount on intrastate hold affidavits before bond hearings and then ignoring the detainee's inquiries as to the correct amount. Count II alleges an official policy or custom of delay in contacting outside counties to retrieve inmates held on out-of-county warrants. Defendants now move for summary judgment on

the ground that Plaintiff has failed to show the existence of an official policy or custom causing the unconstitutional actions alleged in Counts I and II.

**B.      Count I:  Intentional Misrepresentation and**
**Refusal to Allow Plaintiff To Post Bond**

Count I of Plaintiff's Fourth Amended Complaint arises out of the incorrect bond amount transcribed onto the copy of the intrastate hold affidavit in the CCDOC LEADS file and onto the court clerks' call sheet.  Plaintiff alleged that Cook County has an official policy of altering the bond amounts on intrastate hold affidavits and of misrepresenting the bond amounts on out-of-county warrants, a policy that resulted in Plaintiff's wrongful detention.  (Pl.'s Compl. at 11; Pl.'s Am. Resp. at 4.)[6]  The identity of the person(s) who made the alteration has never been determined, however, nor has Plaintiff suggested what motivation Cook County officers would have had to inflate the amount of his D-Bond.  Instead, in his Response to Defendants' Motion for Summary Judgment, Plaintiff argues that regardless of whether the alteration of the bond amount was intentional, what happened to him demonstrates a policy of deliberate indifference to his constitutional rights.  (Pl.'s Am. Resp. at 7-8.)  As explained below, however, the court concludes that the evidence establishes neither a policy or custom of misrepresentation or a policy of deliberate indifference. .

In his Amended Response to Defendant's Motion to for Summary Judgment, Plaintiff notes that the Cook County Sheriff has been sued in the past for errors involving warrants.  He contends these other lawsuits "demonstrate a lack of policy regarding incorrect information relating to warrants."  (Pl.'s Am. Resp. at 9-10.)  The sole case Plaintiff cites, however, is one in which the plaintiff alleged that the Sheriff did not have an adequate policy in place to verify the identity of pretrial detainees.  *See Griffin v. Sheahan*, No. 98 C 2398, 1999 WL 342400, at *8 (N.D. Ill. May 14, 1999).  Judge Schenkier denied a motion to dismiss  in that case, citing three other district court

---

[6]      As Plaintiff did not number the pages in his Amended Response brief, all citations are to the page numbers  electronically stamped by the court's CM/ECF system.

opinions denying motions to dismiss similar claims.  The fact that plaintiffs charging the Sheriff with unrelated constitutional violations have survived motions to dismiss does not constitute evidence of an unlawful policy here, however.  There is no dispute at this stage that Plaintiff has failed to state a claim—indeed, this court, too, denied a motion to dismiss–but Plaintiff cites no case in which arrestees established an unlawful policy after summary judgment or at trial. Plaintiff also cites as a supporting "fact" a report published on July 11, 2008 by the United States Attorney for the Northern District of Illinois concerning a 17-month investigation of conditions at Cook County Jail and addressed to Cook County Board President Todd Stroger and Cook County Sheriff Thomas Dart.  (Pl.'s SOAF ¶ 37; Ex. 16 [Dkt. 134] to Pl.'s Am. Resp. 145.)  Paragraph 37 of Plaintiff's Statement of Additional Facts is an excerpt from that report, addressing inmate grievance procedures and inmates' access to information at Cook County Jail.  (Pl.'s SOAF ¶ 37.)  The United States Attorney's report is hearsay; but even if were properly presented in a Local Rule 56.1(b)(3) statement, the court notes it says nothing about any practice or policy on Defendant's part of routinely ignoring complaints about incorrect bond amounts.

The parties agree that the deputies on duty on "the bridge" were responsible to produce two sets of Plaintiff's paperwork, one for the court clerk's file and the other for the Sheriff's LEADS department.  (*Id.* ¶ 5.)  Because Plaintiff was also being held on an out-of-county warrant, this paperwork included an intrastate hold affidavit, stating the amount of the bond set on the out-of-county warrant. (*Id.* ¶ 4.)  The copy of the intrastate hold affidavit sent to the court clerk listed the correct bond amount of $3000; the version affidavit sent to the Sheriff's LEADS department, however, listed the amount as $30,000. (Defs.' Resp. ¶ 7.)   In addition to the paperwork for these files, a Sheriff's deputy also prepares a "call sheet," used in bond hearings by the courtroom clerk to communicate information about individual defendants to the judge.  (Defs.' 56.1 SOMF ¶ 8.)   In Plaintiff's case, the call sheet reflected the incorrect amount recorded on the intrastate hold affidavit sent to the LEADS department, and the courtroom deputy relied exclusively on the call sheet.

(McGee Dep. 19:17-20:11, 27:17-28:11, Ex. B to Defs.' Mem.)  If the deputy clerk had intended to victimize Plaintiff, one would not have expected her to alter the intrastate hold affidavit destined for the LEADS department, but produce an accurate copy of the affidavit for the court clerk's file—the copy that accompanied Plaintiff to court and the one most likely to be viewed by the judge.

More significantly, the alteration of the intrastate hold affidavit, even if intentional, is not alone enough to show that Plaintiff suffered harm as a result of an official custom or policy of Cook County.  Indeed, Plaintiff now appears to recognize this; in his Response to Defendants' Motion for Summary Judgment, Plaintiff has effectively abandoned the argument that his harm arose only out of Defendants' alleged policy of intentionally altering intrastate hold affidavits and misrepresenting bond amounts.  Now Plaintiff contends that, in addition to the alleged wilful misconduct on the part of the Sheriff's deputies in altering the bond amount, Defendants violated Plaintiff's rights after the court hearing either due to a wilful absence of any policy or procedure for addressing "legitimate" inquiries concerning the accuracy of the Sheriff's information on an inmate's out-of-county warrant, or to a deliberate policy of ignoring and abusing inmates who question officials about their bond amount.  (Pl.'s Am. Resp. at 8-9.)  Plaintiff describes five instance in which he attempted to have a Sheriff's employee confirm his bond amount and was either ignored or rebuffed: While he waited for medical processing after the November 7 bond hearing, Plaintiff approached three different CCDOC employees.  (Pl.'s SOAF ¶ 15.) The first employee merely ignored Plaintiff; the second shoved Plaintiff off her desk and instructed him to remain in line; and the third threw Plaintiff against a wall when he stepped out of line during a strip search.  (*Id.* ¶¶ 16-19.) Then after being assigned to a jail cell, Plaintiff spoke with two deputies about the incorrect bond amount  (*Id.* ¶ 20.)  The first deputy told Plaintiff that he would try to arrange for a chaplain to meet with Plaintiff, and the second deputy promised to raise the issue with his supervisor.  (*Id.* ¶ 21-22.)  Plaintiff heard nothing further in response to these inquiries.  (*Id.* ¶ 23.)

Plaintiff contends that Defendants' treatment of Plaintiff and the lack of response to his

inquiries constitutes deliberate indifference to Plaintiff's substantive due process rights. To meet the Supreme Court's standard for deliberate indifference under the Fourteenth Amendment, Plaintiff must show that Defendants subjected him to a known serious risk of harm but chose to do nothing, even though the harm could easily have been prevented. *City of Canton v. Harris*, 489 U.S. 378, 388-92 (1989). Plaintiff argues that the Cook County Sheriff's Department had "absolutely no policy or plan in place to address the legitimate inquiry as to the accuracy of the Sheriff's information concerning the amount of an out of county warrant," other than a "systematic department wide policy to ignore, intimidate and abuse inmates who make a valid and reasonable inquiry as to the basis of their incarceration." (Pl.'s Am. Resp. at 9.) Plaintiff in essence argues two theories: that Defendants have adopted a constitutionally-unacceptable policy of ignoring all inquiries regarding the basis for a detainee's post-hearing incarceration, or that Defendants have elected not to implement a policy where the circumstances clearly require one. Neither theory is successful here, however, because Plaintiff has not established that Defendants' policy (or lack thereof) caused a constitutional deprivation.

However wise it might have been for Sheriff's officers to investigate Plaintiff's objections to the bond amount, there is nothing inherently unconstitutional about a policy of ignoring a detainee's protestations after the detainee has had the opportunity for an independent judicial hearing. Even under the most conscientiously-designed system, mistakes will be made, and a Sheriff's deputy cannot be expected to heed every claim of error, particularly when he is acting pursuant to a judicial order. *See Hernandez v. Sheahan*, 455 F.3d 772 (7th Cir. 2006). In *Hernandez,* the court found that the Sheriff had an official policy of ignoring "all claims of misidentification (and any other version of the assertion that a suspect is innocent)." *Id.* at 776. As a result, the plaintiff remained in custody for fifteen days following a judicial hearing over his repeated protestations to Sheriff's department employees that he was not the individual named in the warrant. Nonetheless, the court held that the defendant's policy of ignoring all complaints of mistaken identity did not violate due

13

process because the arrestee had been brought promptly to court, and the judge had ordered him held in custody pursuant to a facially valid warrant. *Id.* at 776-77. The court noted that the plaintiff appeared before a judge represented by counsel, but neither he nor his lawyer objected when the judge called him "Enrique Hernandez" rather than "Ernesto Hernandez," his true name. *Id.* at 773-74. As far as the court was concerned, the plaintiff had ample opportunity to resolve the mistaken identity issue before the judge, and the Sheriff's staff had no obligation to investigate his claims of innocence absent some showing that the court had abdicated its judicial responsibility of independent decision-making. *Id.* at 776-77.

Defendants concede that while Plaintiff was custody, at least five Sheriff's department employees ignored his repeated claims that his bond amount was incorrect. Under *Hernandez*, these incidents are enough to support the inference that Defendants had an official policy of ignoring inmates' complaints about his bond amount. But, also as in *Hernandez*, Plaintiff was afforded a prompt hearing before a judge where he was represented by counsel. Plaintiff has introduced no evidence that Defendants or their employees believed they were detaining Plaintiff pursuant to anything other than a valid court order. Ignoring his complaints–even if characterized as a function of official policy–did not violate the Constitution under these circumstances. *See id.* at 776 (holding that a policy of ignoring all claims of misidentification "is an entirely lawful policy unless the custodian knows that the judge refuses to make an independent decision or there is doubt about which person the judge ordered held."); *cf. Patton v. Przybylski*, 822 F.2d 697, 700-01 (7th Cir. 1987) (keeping a man in custody for several days "over his vigorous protest that he is the wrong man . . . *without either investigating the case or bringing him before a magistrate* raises serious constitutional questions . . . under the due process clause") (emphasis supplied).

Plaintiff cites *Griffin v. Sheahan*, No. 98 C 2398, 1999 WL 417342, at *2 (June 16, 1999), for the proposition that a judicial determination is not dispositive of a custodian's duty to investigate. *See also Johnson v. City of Chicago,* 711 F. Supp. 1465, 1470 (N.D. Ill. 1989) (concluding that

arrestee held for eight days due to a misidentification failed to state "official policy" claims, but recognizing that a court order that plaintiff be detained does not absolve *police officers* who were responsible for the mistaken identification on which the court relied). But *Griffin* does not, as Plaintiff seems to suggest, establish that a custodian who fails to investigate a detainee's complaints may be liable regardless of any determinations made at a judicial hearing. Instead, the court concluded that the facts surrounding the hearing ("what happened before the judge, and when it happened in the detention process") were a matter for discovery. *Griffin*, 1999 WL 417342, at *2.

The *Griffin* court did attempt to resolve conflicting precedents articulated in *Johnson* and *Patton* regarding the impact of a judicial hearing on a custodian's duty to investigate claims of mistaken identity. In *Johnson,* the plaintiff was taken before a judge within 24 hours of his arrest on a valid warrant, but then detained for six days after his first appearance because, relying on a misstatement from police officers that he was wanted on a warrant, the judge had remanded him to police custody. *Johnson*, 711 F. Supp. at 1470. The *Johnson* court held that the plaintiff had successfully alleged that police officers had violated his rights, but nevertheless dismissed the complaint for failure to connect the deprivation with a custom or policy of the City. *Id.* at 1470-71. In *Patton*, on the other hand, police arrested plaintiff on a warrant for another individual who had the same name and held plaintiff for six days before taking him before a judge. The court nevertheless affirmed summary judgment in favor of the defendant officer, noting that he had done nothing more than arrest plaintiff pursuant to a valid warrant. *Patton*, 822 F.2d at 700. To the extent that the *Patton* court addressed the significance of a judicial hearing, it simply pointed out that plaintiff had not shown that the sheriff, as a named defendant, was responsible for any unconstitutional delay. *Id.* Considering these cases together, *Griffin* declined to adopt, at the motion to dismiss stage, defendants' argument that "any appearance before a judge automatically, as a matter of law, absolves the custodian from any obligation to conduct even a minimal

investigation into identity that would prevent a prolonged detention." *Griffin*, 1999 WL 417342, at *3. The court did not state under what circumstances a custodian would be obliged to investigate a detainee's claims or whether the obligation to investigate extends beyond cases of mistaken identity. Unlike the defendant in *Griffin*, Plaintiff Hargarten comes before the court in response to Defendants' motion for summary judgment. Plaintiff has had the opportunity for extensive discovery and has failed to present any evidence that his prompt judicial hearing was compromised. And it is undisputed that Defendants had lawful custody of Plaintiff pursuant to a valid warrant in his name and a valid court order.

The more recent case of *Zurita v. City of Chicago*, No. 02 C 3771, 2003 WL 22127588, at *1 (N.D. Ill. Sept. 15, 2003), not cited by either party, addresses in greater detail than *Griffin* the liability of County defendants for wrongfully holding an individual detained pursuant to a valid court order. Like Plaintiff here, Zurita filed suit against Cook County for wrongfully detaining him after a prompt judicial hearing. *Id., at *2.* Zurita appeared before a judge following his arrest on a mistake of identity and, on the advice of his public defender, pleaded guilty to criminal trespass charges rather than dispute the mistaken identity issue. *Id.* Following this initial hearing, another judge ordered Zurita held at Cook County Jail on an unrelated domestic violence charge against the same person for whom police had mistaken Zurita. *Id.* Again, neither Zurita nor his attorney objected. *Id.* During his confinement, however, Zurita repeatedly informed Cook County officers that he was the wrong man, to no avail. *Id.*

In Zurita's subsequent due process case, Judge Lefkow of ths court disagreed with the *Griffin* court's view that the Cook County Sheriff's department could be held liable under § 1983 even when the Sheriff acted pursuant to a court order. *Id.*, at *4. To the contrary, Judge Lefkow held, "[a] mere custodian is not required to evaluate the sufficiency of court orders under the threat of civil actions." *Id.* (quoting *Arensman v. Brown*, 430 F.2d 190, 194 (7th Cir. 1970)). In addition, the court noted that Zurita had appeared before two different judges before his detention by the

county defendants and had not attempted to bring the mistake of identity to the court's attention on either occasion.

Like Zurita, Plaintiff Hargarten appeared before a judge where he was represented by counsel and had the opportunity to object to the erroneous bond amount (about which he was apparently aware since the time of his arrest). Plaintiff testified in his deposition that the court interrupted Plaintiff when he tried to object to the bond amount. (Hargarten Dep. 24:4-12, 25:11-18, Ex. 4A to Pl.'s Am. Resp.) Even assuming the hearing transcript (presented by neither party in this case) supports this assertion, these circumstances do nothing to establish that a policy or custom *of Defendants* caused Plaintiff's alleged constitutional deprivation. So far as the Sheriff's staff knew, they were detaining Plaintiff pursuant to a valid court order and, like the defendants in *Hernandez* and *Zurita*, were under no obligation to investigate the sufficiency of that order. The court notes, further, that unlike the plaintiffs in the cases he cites, Plaintiff Hargarten was not arrested by mistake; he was the very person named in the warrant. Even under a court order that accurately reflected Plaintiff's bond amount, Defendants had the legal authority to keep Plaintiff in custody if he could not post the bond, whether that amount was $30,000 or $300.

Plaintiff additionally cites *Armstrong v. Squadrito*, 152 F.3d 564 (7th Cir. 1998)*,* where the Allen County Sheriff held Armstrong in custody for 57 days on a body attachment without affording him a court appearance. The warrant had issued after Armstrong failed to appear for a contempt hearing regarding child support arrearages, and he voluntarily surrendered, expecting to be released in a matter of hours. *Id.* at 567. As it happened, someone in the sheriff's office had incorrectly transcribed Armstrong's warrant number on the form submitted to the court, and consequently, the court did not know plaintiff was awaiting an appearance. *Id.* at 568. As the days wore on, Armstrong repeatedly asked guards and other officers when he could expect to appear in court, but was ignored or told that it was not unusual for inmates to wait 60 or even 90 days on the court's "will call" list. *Id.* The guards did check the "will call" list on the jail's computer several

times, but due to the transcription error on the warrant, the list did not show a court date or release for Armstrong. *Id.* Armstrong also attempted to prepare and submit written complaints, but the guards refused to accept them, telling Armstrong that it was pointless to turn them in when they could check the computer for him themselves. *Id.* Reversing summary judgment in favor of defendant sheriff and jail official, the *Armstrong* court held, among other things, that the jail's "backup plan" of accepting formal written complaints would ordinarily have defeated any claim arising out of its alleged conscious failure to establish a policy for determining whether it had the proper authority to hold a detainee. *Id.* at 578-9. The jail's informal custom of refusing to accept those very complaint forms, however, "display[ed] a conscious disregard of a known danger"—in this case, the danger of prolonged wrongful detention—"analogous to a policy of refusing to act upon a reasonable request for medical assistance." *Id.*

Plaintiff argues that, like the defendants in *Armstrong*, Defendants have attempted to abdicate their duty of ensuring that they had legal authority to hold Plaintiff. Like *Armstrong*, this case involves an improperly transcribed warrant. Also as in *Armstrong*, the jail officials here ignored Plaintiff's repeated requests for information about his confinement. Unfortunately for Plaintiff, the similarities end there. The defendants in *Armstrong* held the plaintiff without bond, effectively denying him the right to a hearing by continuing to ignore or deny his requests for information. Plaintiff, by contrast, had a hearing before a judge the day after his arrest, at which he was represented by counsel and had the opportunity to dispute the bond amount. Although the record does not include all the details of Plaintiff's hearing, Plaintiff has not suggested Defendants had any reason to suspect that the court was biased or had otherwise abdicated its duty to render an independent decision. While it is true that neither the judge or the courtroom deputy questioned the unusually high bond amount, neither, apparently, did Plaintiff or his attorney bring it to the court's attention. That the incorrect bond amount relied upon by the court originated in the Sheriff's Department does not impute liability to Defendants without some connection to an official custom

or policy of Defendants.

Finally, in *Armstrong* the existence of the complaint form system showed the defendants' awareness of a "plain and obvious danger" of prolonged, pretrial detention and a disregard of that danger through a policy of refusing to implement their own failsafe procedure. *Armstrong*, 152 F.3d at 578; *see also Griffin*, 1999 WL 342400, at *1 (holding that an alleged policy of ignoring pretrial detainee's claims of mistaken identity despite defendants' knowledge that such mistakes were bound to occur was sufficient to state a claim under § 1983); *Rivas v. Freeman*, 940 F.2d 1491 (11th Cir. 1991) (sheriff was liable under § 1983 in case of mistaken identity because he knew of prior instances of mistaken identity and failed to adequately train deputies in reliable identification techniques). The only evidence Plaintiff has presented of Defendants' awareness of a "plain and obvious" danger consists of lawsuits filed against Defendants for detention based on mistaken identity *prior to* a judicial hearing. There is no evidence that Defendants were on notice of other incidents in which Sheriff's officers ignored inmates' legitimate, post-hearing claims that they were held on incorrect bond amounts, or that Defendants' conduct demonstrated a pattern or policy of intentionally misrepresenting bond amounts on intrastate hold affidavits. *See Johnson*, 711 F. Supp. at 1473 (dismissing plaintiff's complaint for "merely alleg[ing] his own specific incident with no other facts indicating a custom or policy to inadequately train . . . police [in proper identification procedures]").

Plaintiff has failed to show a genuine issue of material fact regarding the existence of an unconstitutional custom or policy on the part of Defendants. In detaining Plaintiff after his bond hearing, Defendants were acting pursuant to a valid court order and had no duty under the circumstances to heed Plaintiff's inquiries or protestations regarding the amount of his bond on the DuPage County warrant.

## C.      Count II:  Policy of Delay in Contacting Outside Counties

In Count II of his Fourth Amended Complaint, Plaintiff alleges that Defendants' policy

19

caused a delay in notifying DuPage County that Plaintiff was in Cook County custody, resulting in his detention at Cook County Jail for seven days after his bond hearing. This claim fails both legally and factually.

Beginning with the law: Plaintiff cites *Kyle v. Patterson*, 196 F.3d 695 (7th Cir. 1999) as his primary authority. In *Kyle,* the court affirmed that a 61-hour detention without charge following arrest on a valid warrant violated Fourth Amendment under the 48-hour rule established in *Gerstein v. Pugh. Id.*; *Gerstein v. Pugh*, 420 U.S. 103, 114 (1975) (Fourth Amendment requires a judicial determination of probable cause within 48 hours of a warrantless arrest). Both *Kyle* and *Gerstein* are inapposite here. Plaintiff was arrested pursuant to a valid warrant and brought before a judge within 24 hours of his arrest. Plaintiff contends that Defendants' alleged policy of delaying notification to other counties *after* Plaintiff's initial appearance caused the constitutional deprivation, but he cites no authority for this theory, and the court is aware of none.

Nor do the facts establish the existence of any official policy or custom of delayed notification at the time Plaintiff was in custody. To the contrary, both Lieutenant Zeno-Johnson and Ms. Tyner testified that the CCDOC's official policy was to notify outside agencies the same day they received a detainee's paperwork, typically the day after CCDOC accepted custody of the detainee. (Defs.' 56.1 ¶ 36; Defs.' SOAF ¶ 3.) Ms. Tyner acknowledged that it sometimes takes as long as three days for CCDOC to notify an outside agency, but stated that such delays were in violation of policy, and that a delay as long as four days never occurred. (Defs.' SOAF ¶ 4.) In contrast to CCDOC, DuPage County apparently lacked any formal policy for picking up out-of-county prisoners beyond a vague "reasonable response time" standard. (Pl.'s SOAF ¶ 32.) Lieutenant Keltner did testify, however, that the DPCFAU "usually" picked up out-of-county prisoners the day they were notified up until 3 p.m.; if the notice came after that time, pick-up would typically occur the following morning. (*Id.*) Because in 2003 CCDOC did not keep time records of their contacts with outside agencies, Plaintiff cannot show whether the delay was caused by

CCDOC or DCFAU.[7]  But regardless of whether CCDOC or DCFAU was responsible for the delay, Plaintiff has not presented evidence that any custom or policy of Defendants caused him to remain in Cook County Jail for the seven days following his bond hearing.  Assuming that CCDOC was responsible, Plaintiff has shown at most that CCDOC employees failed to act pursuant to the Department's official policy in his case.  The court must therefore grant summary judgment in favor of the Defendants on Count II.

## CONCLUSION

Defendants' Motion for Summary Judgment (96) is granted.

ENTER:

Dated: January 15, 2009

_____
REBECCA R. PALLMEYER
United States District Judge

---

[7]    After 2003, the CCDOC policy changed to require Records Department employees to make notifications concerning out-of-county warrants through teletype or fax.  The current CCDCOC policy requires the Records Department to make notification through the LEADS computer system, which creates an electronic record of the communication.  (Defs.' SOAF ¶¶ 5-6.)